IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

REYNOLDS METALS COMPANY, et al.,

                    Plaintiffs,

v.

UNITED STATES OF AMERICA,

                    Defendant.

Civil Action Number 3:02CV670-JRS

## MEMORANDUM OPINION

THIS MATTER is before the Court on the parties' cross motions for partial summary judgment.[1] Reynolds Metals Co. ("Reynolds") is seeking a total tax refund of $22,271,747.00 which it claims resulted from the overstatement of its gross income from 1940 through 1987.

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Smith v. Continental Casualty Co., 369 F.3d 412, 417 (4th Cir. 2004) (citing Fed. R. Civ. P. 56(c) and Celotex Corp. v. Cetrett, 477 U.S. 317, 322 (1986). "When faced with cross-motions for summary judgment, the court must review each motion

---

[1] On August 1, 2005, the parties filed an agreed upon motion to amend the Complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Reynolds proposed to amend its Complaint by adding two refund claims for the tax years 1992 through 1995; the first claim is pending before the United States and Canadian competent authorities for the relevant tax years. The second claim pertains to agreed-upon adjustments for the tax years 1992 through 1995 under review by the Joint Committee of Taxation. Reynolds hopes to preserve its ability to appeal any adverse decision on these two claims following entry of this Court's judgment. By a separate order entered contemporaneously with this Opinion, the agreed-upon motion will be granted.

separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.  When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  Rossignol v. Voorhaar, 316, F.3d 516, 523 (4th Cir. 2003) (internal quotations and citations omitted).

(i) The Complaint

Reynolds and its subsidiaries seek recovery of income taxes and applicable interest for the taxable years 1992 through 1995.  According to Reynolds, the amounts at issue are as follows: $7,023,004.00 in 1992; $2,603,965.00 in 1993; $5,935,322.00 for 1994 and $6,709,456.00 in 1995. This Court has jurisdiction over this matter because it involves a "civil action against the United States for the recovery of [an] internal-revenue tax . . . erroneously or illegally assessed or collected." 28 U.S.C. § 1346(a)(1).  The parties agree that Reynolds exhausted its administrative remedies and that this case is properly before the Court.

According to the Complaint, Reynolds' manufacturing operations generate waste byproducts. Reynolds claims that between 1940 and 1987, it utilized waste disposal practices in accordance with industry standards and federal regulations.  During the nearly five decades, Reynolds claims that it included the disposal costs in the computation of its gross income for income tax purposes.  In subsequent years, Reynolds learned that its waste disposal practices were inadequate when it incurred liability under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.  42 U.S.C. § 9601 et seq.  As a result, during the years 1992 to 1995, Reynolds incurred

2

substantial environmental remediation costs to re-dispose of the waste byproducts and to remediate contaminated areas.[2]

Reynolds contends that the environmental remediation costs borne during the 1992 to 1995 taxable years are allocable to revenue reported by Reynolds in the years 1940 to 1987. Therefore, Reynolds insists that it understated the waste disposal costs for those five decades. This understatement, according to Reynolds, caused its cost of goods sold to be understated and, consequently, caused it to overstate its gross income for the years 1940 to 1987. Reynolds sought a refund of the excess taxes paid during those years but the IRS has refused its claims.

According to Reynolds, if it treats the environmental remediation costs as deductible in the years 1992 through 1995 rather than allocable to the years 1940 to 1987, Reynolds would not receive the full tax benefit of its costs as a result of the differences in tax rates during the relevant years. The corporate tax rates for the years 1940 through 1987 were substantially higher than the tax rates from 1992 to 1995.

Reynolds insists that the Internal Revenue Code, and specifically 26 U.S.C. § 1341, provides a remedy for this contingency caused by the timing differences in the tax rates. According to Reynolds, § 1341 applies when a taxpayer recognized gross income in a prior year because the taxpayer had an unrestricted right to such income, only to discover later that it did not have such a right. Section 1341 provides that the affected taxpayer may (i) claim a deduction in the later year to offset the overstatement in the prior year or (ii) reduce its tax for the later year by the decrease in

---

[2]"CERCLA was a congressional response to public concern over the improper disposal of hazardous waste, and its two primary goals have been recognized as (1) the promotion of prompt and effective cleanup of hazardous waste sites, and (2) the sharing of financial responsibility among those parties who created the hazards." S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co., 372 F.3d 245, 251 (4th Cir. 2004) (internal quotations omitted)

tax for the prior year that would have resulted if the taxpayer reported the correct amount of gross income in the prior year.  Simply stated, the taxpayer is permitted to recover his tax overpayment. Applying these principles would result in the refunds mentioned above.

### (ii) Reynolds Motion for Partial Summary Judgment

Reynolds's Motion for Partial Summary Judgment seeks a determination of whether it is entitled to relief under § 1341.  After Congress passed extensive environmental legislation in the 1980s, Reynolds expended over $110 million remediating the sites of its prior operations.[3]  Between the years 1940 and 1987, Reynolds' manufacturing operations generated taxable income from the production of aluminum products.  During those years, Reynolds' tax rate was usually 46% or higher.  In 1987, Reynolds' tax rate dropped to 35%.  As a result of the increased environmental clean-up costs and the lowered tax rate, Reynolds insists that it is entitled to a refund because it overstated its gross income for the years 1940 through 1987 due to the understated environmental costs.

Reynolds' motion asks the Court to decide three issues: (1) whether Reynolds had an unrestricted right to an item included in gross income for tax years 1940 through 1987; (2) whether Reynolds is entitled to a deduction for tax years 1992 through 1995 because Reynolds did not have an unrestricted right to the earlier item of gross income; and (3) whether the "inventory exception" applies to deny Reynolds relief.

---

[3]Reynolds stated its environmental remediation costs as follows: 1992 - $33,905,846.00; 1993 - $16,873,658.00; 1994 - $33,434,422.00; and 1995 - $34,787,065.00.

4

According to Reynolds, the waste disposal costs were inventoriable costs included in the computation of Reynolds' cost of goods sold for the relevant tax years.[4]  During the tax years 1992 through 1995, Reynolds conducted environmental remediation activities related to waste byproducts generated in prior years.  For federal income tax purposes, Reynolds treated the costs of these clean-up activities as either (i) ordinary and necessary business expenses deductible under § 162 (itemized deductions for trade or business expenses) or (ii) capitalized expenditures under § 263 (items not deductible; capital expenditures) which Reynolds amortized over a period of years.

### (iii) Title 26, U.S. Code § 1341

According to Reynolds, § 1341 remedies inequities caused by the "claim of right" doctrine.  Under the claim of right doctrine, a taxpayer must report taxable income in the year it is received.  See United States v. Lewis, 340 U.S. 590, 591 (1951).  If, during a subsequent tax year, a taxpayer discovered that he was not entitled to the previously claimed income, his only option was to claim a deduction in the year of repayment; the taxpayer was not permitted to recalculate his previous income and tax liability.  An inequity resulted to the taxpayer when the deduction at a later year is taken at a lower tax rate.[5]

To rectify the inequity, Congress enacted § 1341 in 1954 as part of a massive revision to the tax code, see Public Law No. 83-591, 68A Stat. 348.  Generally, § 1341 treats the change in tax rate

---

[4]The United States disputes this fact in its cross-motion for partial summary judgment.

[5]The inequity is best explained by an example.  Suppose an employee receives a $10,000 bonus in year 1 and pays tax of $3,000 based on his 30% tax rate.  If in year 3, the employee is required to return $4,000 because of an error by his employer in calculating the bonus, the employee would be entitled to a $4,000 deduction in year 3.  If the year 3 tax rate is now 20%, the employee receives an $800 tax benefit ($4,000 * 20%).  However, the employee paid $1,200 in taxes on that $4,000 in year 1 ($4,000 * 30%).  As a result of the change in tax rate, the employee's year 3 deduction did not make him whole.

5

as a tax neutral event by permitting the taxpayer to take a deduction at the same tax rate at which the relevant income was taxed.  Reynolds insists that it is entitled to be placed in a tax neutral position through the application of § 1341.  Reynolds argues that if it incurred the increased environmental clean-up costs during the years when the goods associated with the waste disposal were sold, its cost of goods would have been higher which would have reduced its gross income and lowered its tax bill.

Reynolds argues that it could take a deduction associated with the remediation costs in the tax years 1992 through 1995, but the lower tax rates do not place it in a tax neutral position relative to the tax liability it incurred from 1940 to 1987.  Reynolds insists that the holding in Pennzoil-Quaker State Co. v. United States, 62 Fed. Cl. 689 (2004), is exactly on point and should control the outcome of this case.

Code section 1341 provides that if

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable years shall be the lesser of the following:

(4) the tax for the taxable year computed with such deduction; or

(5) an amount equal to –

6

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

26 U.S.C. § 1341(a) (1995).  Section 1341 also contains the "inventory exception" to the general rule.  According to the inventory exception, section 1341

does not apply to any deduction allowable with respect to an item which was included in gross income by reason of the sale or other disposition of stock in trade of the taxpayer (or other property of a kind which would properly have been included in the inventory of the taxpayer if on hand at the close of the prior taxable year) or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

26 U.S.C. § 1341(b)(2).  Stated simply, the deduction does not apply if related to the return of income received from inventory sales or sales of stock in trade.

Reynolds insists that it meets the requirements of subsection (a).  First, the United States stipulated that the remedial costs exceeded $3,000.  Second, Reynolds claims that it overstated its gross income from the sale of aluminum products because it understated its waste disposal costs, which it treated as an element of the cost of goods sold.  Third, the tax years 1992 through 1995 established that Reynolds did not have an unrestricted right to the income it claimed during the 1940 through 1987 tax years because of the significant additional sums it was required to expend to remediate the sites of its prior clean-up efforts.  Finally, Reynolds insists that the inventory exception does not preclude its reliance on § 1341(a) because the exception is limited to items such as sales returns which do not include the environmental remediation costs.

7

### (a) <u>Unrestricted Right to an Item Included in Gross Income</u>

Reynolds claims that it satisfied the first requirement under § 1341(a) because of its unrestricted right to an item included in gross income. Reynolds argues that it must demonstrate that an item was included in gross income for a prior taxable year and that Reynolds included that item under a belief that it had an unrestricted right to the item. To resolve this first issue, the Court must determine the definition of "gross income." Reynolds contends that "gross income" means "gross receipts" minus "cost of goods sold." The United States insists that "gross income" simply equates to "gross receipts."

Reynolds maintains that the general definition of "gross income" supplied in 26 U.S.C. § 61 applies because section 1341 does not define "gross income." Section 61(a) states that "gross income means all income from whatever source derived, including (but not limited to) the following items." One of the listed items is the "[g]ross income derived from business." The associated Treasury Regulations for section 61 state that "[i]n manufacturing, merchandising, or mining business, 'gross income' means the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources." Treas. Reg. § 1.61-3(a). From these cross-references, Reynolds cobbled together its definition for gross income – "gross receipts" less the "cost of goods sold."

Therefore, Reynolds claims that it included an item in gross income for its taxable years 1940 through 1987 that overstated its gross income as a result of the understated cost of goods sold. Reynolds argues that if it spent the remedial clean-up money during the previous five decades, its cost of goods would have been higher and its gross income would have been lower than otherwise reported. The item of income, according to Reynolds, is the amount of the overstatement.

(b) <u>An Unrestricted Right when Paid</u>

Reynolds claims an unrestricted right to the item included in gross income from 1940 to 1987 and rejects any attempt to distinguish between an actual right to the item of gross income and an apparent right.  According to the Fourth Circuit, "[a]ll that § 1341(a)(1) requires is that an item [be] included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item."  <u>Dominion Resources, Inc. v. United States</u>, 219 F.3d 359, 364 (4th Cir. 2000).  The item, according to Reynolds, is the overstatement of gross income and that it appeared that it had an unrestricted right to the item included in gross income.[6]

(c) <u>Later Discovered that Reynolds did not have an Unrestricted Right to an Item Included in Gross Income</u>

Reynolds insists that it would be entitled to a deduction for environmental remediation expenses incurred during the tax years from 1992 through 1995 under 26 U.S.C. § 162 for ordinary and necessary business expenses.  However, taking the deductions in these later years is not as valuable to Reynolds as it would have been if Reynolds incurred the costs during the years that the waste byproducts were actually generated.  These additional environmental costs, according to Reynolds, are directly attributable to Reynolds' production activities and its apparently inadequate waste disposal practices.  Reynolds insists that but for its prior production activities and waste disposal practices, Reynolds would not have incurred the environmental remediation costs in 1992 through 1995.

(d) <u>The Inventory Exception</u>

---

[6]Reynolds refers to the "item" as the overstatement of gross income; that is, the extra income it reported as a result of its understated cost of goods.  Reynolds insists that the United States mistakenly asserts throughout its brief that the "item" included in gross income is the understatement of its costs.

9

Reynolds claims that the inventory exception does not apply. The inventory exception precludes § 1341 relief with respect to "any deduction allowable with respect to an item which was included in gross income by reason of the sale or other disposition of stock in trade of the taxpayer . . . or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C. § 1341(b)(2). According to Reynolds, the inventory exception is limited to sales returns and allowances and similar items. See Treas. Reg. § 1.1341-1(f)(1). Reynolds insists that the inventory exception only applies if the deduction is allowable with respect to an item included in gross income "by reason of" the sale of inventory. Reynolds claims that it overstated its gross income "by reason of" the understatement in the cost of goods and not due to the sale of inventory.

### (iv) Discussion

Justice Brandeis, speaking for a unanimous Court, described the "claim-of-right" doctrine: "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." North American Oil Consolidated v. Burnet, 286 U.S. 417, 424 (1932). If later the taxpayer learns that he is not entitled to keep the money, he would be entitled to a deduction in the year of repayment; however, the taxes he paid in the year he received the money would not be affected. "This approach was dictated by Congress' adoption of an annual accounting system as an integral part of the tax code." United States v. Skelly Oil Co., 394 U.S. 678, 681 (1969) (citing Burnet v. Sanford & Brooks Co., 282 U.S. 359, 365-366 (1931).

10

The downside to the claim of right doctrine is that the taxpayer faces the possibility that the tax benefit from the year of repayment might be less than the taxes paid upon receipt because of a change in tax rates or because the taxpayer finds himself in a lower tax bracket.  However, "these discrepancies were accepted as an unavoidable consequence of the annual accounting system." Skelly Oil, 394 U.S. at 681.  To alleviate the possible inequity created by the doctrine, Congress enacted § 1341 of the Internal Revenue Code.  "As an alternative to a deduction (e.g., as a capital loss) in the year of repayment, § 1341 permits certain taxpayers to reduce their taxes in the year of repayment by the amount of additional tax paid in the year of receipt due to the amount in question." Culley v. United States, 222 F.3d 1331, 1334 (Fed. Cir. 2000).  The net effect is that the taxpayer can recompute his taxes for the year in which he originally received the money, excluding from his income that amount which he later repaid.

The concept of § 1341 is easy to understand but can result in taxpayer efforts to manipulate its intended result or its traditional purpose.  Reynolds' Motion is a perfect example of a taxpayer trying to take advantage of the Code's generosity.  Reynolds claims that it received additional income because it understated its disposal costs as evidence by the fact that it was required to spend over $100 million to remediate its past disposal efforts.  As the Court understands the argument, Reynolds insists that its disposal costs were a component of its cost of goods so that any increase in its disposal costs would have reduced its gross income.[7]

---

[7]Reynolds does not explain why it would not have passed the increased costs of its goods on to consumers in order to maintain its profit margin.  Indeed, Reynolds asks the Court to assume that its gross receipts would remain the same while its cost of goods increased.  Essentially, Reynolds is arguing that it undercharged its customers because it miscalculated its expenses for 1940 based on remediation payments it made from 1992 through 1995.  But even it the Court engages in the necessary fiction and allows Reynolds to project its expenses back through the decades, the Court must make the large assumption that Reynolds would not have raised its prices to recover its

When the courts write about the claim of right doctrine, the typical situation involves a taxpayer who received income in one year then repaid some or all of the amount in a later year. In Culley, the Federal Circuit wrote that § 1341 "applies when a taxpayer repays money in a current year that belongs to someone else, but was money that he received and included in gross income in a prior year." Culley, 222 F.3d at 1336. Mr. Culley claimed the benefit of § 1341 when he repaid money as part of a combined criminal and civil settlement agreement for his part in a scheme to defraud AT&T and a potential purchaser of his corporation. Mr. Culley argued that the $3 million repaid in 1991 was a restoration of amounts he included in his gross income in 1988 and on which he paid taxes. The Federal Circuit ultimately denied Mr. Culley's claim because he could not demonstrate an unrestricted right to the money he received in 1988. The Court wrote that "[w]hen a taxpayer knowingly obtains funds as the result of fraudulent action, it simply cannot appear from the facts known to him at the time that he has a legitimate, unrestricted claim to the money." Id. at 1335.

While the holding in Culley is not applicable to Reynolds' claim, it does illustrate the purpose behind section 1341. The Court stated that "[t]his is not a situation in which an act not involving intentional wrongdoing – incorrect salary or bonus computation, mistaken distribution of estate proceeds, or erroneous partnership or trust distributions, for example – gives rise to the appearance of an unrestricted right." Id. at 1336. While by no means an exhaustive list of examples, they do demonstrate the simplicity embodied by the title of section 1341 - "computation of tax where

---

increased inventoriable expenses. The fact is that Reynolds cannot show that it would have paid a smaller tax bill in 1940 if it would have spent more money to dispose of its waste byproducts. The assumption is simply too speculative because we are dealing with an expense rather than a fixed item of income received from a consumer which Reynolds was forced to return in a later year.

taxpayer restores substantial amount held under claim of right" - so that the taxpayer is restoring an amount previously received to his boss, an estate, a partnership or a trust, for example.

According to the Treasury Regulations, "restoration to another means a restoration resulting because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item." 26 C.F.R. § 1.1341-1. Without question, Reynolds can demonstrate an unrestricted right to the income it received from its customers during the years 1940 through 1987; Reynolds believed it had an unrestricted right to these items of income. But Reynolds cannot reasonably argue that it restored those amounts previously received to its customers or to a connected third party. CERCLA forced Reynolds to expend money to remediate past environmental contamination in amounts sufficient to curtail the damage; Reynolds cannot argue that its remediation costs were related to or in proportion to its past sales.

Reynolds relies heavily on two cases in support of its claim. In the first case, <u>Pennzoil-Quaker State Company v. United States</u>, 62 Fed. Cl. 689 (Ct. Cl. 2004), the Court of Federal Claims held that antitrust settlement payments to settle a price-fixing case brought by the Quaker State's oil suppliers qualified for § 1341 relief. Quaker State bought crude oil from independent oil producers from 1981 through 1995. Quaker State used this oil to produce motor oil which it sold to customers. In 1994, many of the independent oil suppliers brought suit against Quaker State for price fixing which allegedly reduced the price at which the suppliers could sell their oil to Quaker State. Quaker State eventually settled the lawsuit for $4.4 million.

The court of claims made several important findings in granting Quaker State's motion for summary judgment and allowing its claims under § 1341. First, Quaker State argued that "gross income" included gross income derived from business and that "gross income derived from

business" is defined as the total sales less the cost of goods sold.  See 26 C.F.R. 1.61-3(a).  Quaker

Stated asserted that an item included in gross income "is the unit of gross receipts less cost of goods

sold."  Pennzoil, 62 Fed. Cl. at 694.  The Court held that

> [a]s Plaintiff is in the 'manufacturing, merchandising, or mining
> business,' it seems clear that Treasury Regulation 1.61-3(a) applies
> and that Plaintiff possessed an 'item . . . included in gross income'
> because its [cost of goods sold] was understated, which led to the
> item of gross income from business being inflated.

Id. at 695.  In addition, the Court found that the settlement payments would have been considered

part of the cost of goods sold if paid in the years the gross receipts were earned.  Thus, the Court

assumed that Quaker State would have paid more for its supply of oil.  The Court concluded that

"the settlement payment to Quaker State's oil suppliers was clearly cost of goods sold, as [cost of

goods sold] includes inventory, and inventory includes all raw materials that physically become part

of the merchandise (in this case, oil)."  Id. at 695-96.  The Court reasoned that since Quaker State

paid its suppliers less than it should have during the relevant years, its cost of goods sold was

reduced, "and its 'item' (the unit of gross receipts less cost of goods sold) was inflated."  Id. at 696.

Second, the Court examined the appearance of an unrestricted right to the item.  The court

agreed with the Fifth Circuit's interpretation that "the appearance of an unrestricted right" means

"the appearance *to the taxpayer* of an unrestricted right."  Id. (citing McKinney v. United States,

574 F.2d 1240, 1243 (5th Cir. 1978)).[8]  The Court found that "[s]ince Quaker State took into

---

[8]Some courts have distinguished between an "apparent right" and an "actual right" where an actual right to the item of income bars application of § 1341 to the taxpayer.  Those courts reason that the claim of right doctrine was only applied where there was a legitimate dispute as to the taxpayer's entitlement to the item of income.

In Equitable Life Ins. Co. of Iowa v. United States, 340 F.2d 9 (8th Cir. 1965), the taxpayer, a life insurance company, redeemed government bonds before maturity and was required to refund part of the interest previously received.  The insurance company tried to invoke the claim of right

income the unit of gross receipts from oil product sales less the cost of goods sold, it is clear that

Quaker State believed that it had a right to that income." Pennzoil, 62 Fed. Cl. at 698.

　　　Third, the Court examined whether the taxpayer asserted an allowable deduction. The court

relied on the applicable Treasury Regulation[9] to determine whether the deduction is allowable;

accordingly, a deduction is permitted because of "the restoration to another of an item which was

included in the taxpayer's gross income for a prior taxable year (or years) under a claim of right."

26 C.F.R. § 1-1341-1(a)(1). Although the body of § 1341 does not mention restoration of an item

of income to another, clearly the title of the statute contemplates restoring the item previously paid.

In Pennzoil, the United States argued that Quaker State did not restore an item of income because

its income was received from *customers* in the prior taxable years but returned to the *suppliers*

─────────────────

doctrine and the § 1341 offset. The Eighth Circuit rejected the taxpayer's reliance on the doctrine, stating that

> [t]here was never any question of the absolute right of appellants to collect and receive the interest on the government bonds. The refund of a part of the interest received was not brought about because of adverse claims to the amounts refunded, but because appellants voluntarily exercised their option to redeem the bonds before maturity.

Id. at 15. As previously stated by the Court of Federal Claims, "the claim of right doctrine is not the *sine qua non* of what is income, but rather is a concept limited to a relatively narrow band of circumstances that does not include situations in which a taxpayer receives income under an actual right." Cinergy Corp. v. United States, 55 Fed. Cl. 489, 504 (Ct. Cl. 2003). Unfortunately, the absolute or actual right concept is not easy to pin down because the right will almost always appear to be what it actually is. See Dominion Resources, Inc. v. United States, 219 F.3d 359, 364 (4th Cir. 2000) (holding that an actual right satisfies the requirement for an apparent right).

　　　[9]Courts accord treasury regulations a measure of deference. See e.g. ABC Rentals v. Commissioner, 142 F.3d 1200, 1205 (10th Cir. 1998) ("Unlike treasury regulations, which are promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act, revenue rulings do not have the force and effect of law and therefore are accorded less weight then [sic] regulations.") (internal quotations omitted).

through the settlement agreement.  Id. at 699.  The Court rejected the argument that the income needed to be restored or returned to the same entity from which it came.  Indeed, the Pennzoil court found that "the settlement money was a restoration" with the exception of those portions paid for attorneys' fees and costs as part of the settlement.  Id.

Up until this point, Reynolds' argument is technically correct.  Reynolds skillfully co-opted the definition of gross income for its own means and the Court cannot find fault with its reasoning. However, Reynolds' argument breaks down with regard to the restoration requirement.  At least in Pennzoil, the court could identify some entity connected to Quaker State's activities to whom the restoration was made.  Indeed, the oil suppliers were directly affected by Quaker State's price fixing at the consumer level.  It appears that Quaker State maintained the low prices it charged to the end consumer and so demanded lower prices from its suppliers.  Without the price fixing, one has to assume that the motor oil prices would have been higher and, therefore, the suppliers would have received a higher price for their crude oil without Quaker State's pressure to keep prices lower. While this speculation appears shaky, at least the court could identify an entity who would or should receive the restoration payment.

Reynolds has only demonstrated its obligation to pay for the remediation; it has not demonstrated restoration of an item of income to an entity from whom the income was received or to whom the item of income should have been paid.  Under the facts in Pennzoil, the Court can accept the argument that the oil suppliers should have received certain additional amounts of money for their oil that they did not receive from Quaker State as a result of the price fixing and that Quaker State apparently included this supposed additional income in its bottom line.  While the

<u>Pennzoil</u> court may have stretched to reach this conclusion, at least it could identify an entity entitled to restoration payments.

Reynolds has not made such a showing.  In <u>Chernin v. United States</u>, the Eighth Circuit concluded that "under section 1341(a)(2), funds must actually be repaid to establish that the unrestricted right to those funds has been lost."  149 F.3d 805, 816 (8th Cir. 1998).  Reynolds has not repaid any funds to anyone.  Reynolds was charged, or more accurately held liable, for additional environmental clean-up costs in the face of more stringent standards as a result of its prior manufacturing activities.  Reynolds cannot seriously argue that it is restoring its overstated income to any person or entity in the sense contemplated by § 1341.  Reynolds is technically correct, if the Court follows <u>Pennzoil</u>'s formula for gross income and presumes that Reynolds would not have passed the additional disposal costs on to consumers, that it overstated its income because it understated its cost of goods sold, however, this says nothing about the restoration requirement.  Therefore, Reynolds' remediation cost is not an allowable deduction under section 1341 and is more accurately classified as an ordinary necessary business expense or a capital expenditure.

Forth, the <u>Pennzoil</u> court considered whether Quaker State demonstrated that it, in fact, did not have an unrestricted right to the item.  The court looked for the likelihood that a taxpayer can "demonstrate at least the [probable] validity of the adverse claim."  <u>Pennzoil</u>, 62 Fed. Cl. at 701. In other words, the taxpayer must not have acted voluntarily in repaying the amounts.  The court also discussed a different test – the same circumstances, terms, and conditions test.  This test requires that "the requisite lack of an unrestricted right to an income item permitting deduction must arise out of the circumstances, terms, and conditions of the original payment of such item to the

taxpayer."  Id.; see also Dominion Resources, 219 F.3d at 367.  The court agreed with Quaker States' assertion that "but for the crude oil purchases, Quaker State would not have been named as a defendant . . . and would not have agreed to pay an additional amount."  Pennzoil, 62 Fed. Cl. at 701.

In the instant case, the United States argued that the sale of Reynolds' products bore no relationship to the amount it became obligated to pay for environmental clean-up.  The Court agrees with the assertion by the United States that Reynolds' liability amount is based on the cost of remediation and not on gross  income.  Moreover, there is no evidence that the current remediation costs arose out of the circumstances, terms and conditions of the original payment by Reynolds' customers.  As the United States argues, the deduction claimed in the current year is not on account of a repayment or restoration of an item of gross income included in prior years, rather it is the result of the enactment of retroactive environmental laws.  These are clearly not the same circumstances or conditions of the original payment Reynolds is allegedly restoring.[10]

In Dominion Resources the loss of the unrestricted right to an item of income arose out of the same circumstances as the original payment - Dominion was authorized to bill its customers, as part of the overall cost of its electricity sales, for projected liability of federal income taxes.  In

---

[10]The Fourth Circuit addressed a tax court formulation that placed "workable limits" on § 1341 - "the requisite lack of an unrestricted right to an income item permitting deduction must arise out of the circumstances, terms, and conditions of the original payment of such item to the taxpayer." Dominion Resources, 219 F.3d 367.  Applying this "same circumstances" rule, the Court cited an example of a corporate officer who was not allowed to use § 1341 "when, years after earning dividends, salary, and bonuses, he incurred a civil penalty for violations of an FTC order." Id. at 368 (citing Bailey v. Commissioner, 756 F.2d 44, 47 (6th Cir. 1985).  In Bailey, the Court explained, "the amount of the penalty was not computed with reference to the amount of his salary, dividends, and bonuses, and bore no relationship to those amounts." Bailey, 756 F.2d at 47.  The same is true for Reynolds; the amount of the cleanup costs was unrelated to its allegedly overstated income.

1986, when Congress reduced the maximum corporate tax rate from 46% to 34%, Dominion discovered that it over-collected $10 million which it was required to refund to customers.   In permitting Dominion to take a deduction under § 1341, the Court wrote that "[b]oth DRI's authorization from regulatory authorities to collect the $10 million and its obligation to repay that amount arose from DRI's liability to the federal government for deferred income taxes."  Dominion Resources, 219 F.3d at 368.  One important factor in Dominion's ability to take the deduction was that it allocated the refunds to actual customers who made the overpayments, where such identification was possible.  Dominion Resources, 219 F.3d 369.  Reynolds cannot make such an identification.

Finally, the Pennzoil court addressed the inventory exception.  The court found that the inventory exception did not apply when it limited the inventory exception to items of income that can be classified as a "sales return, allowance, or item similar thereto."  Id. at 703.  In the instant case, the Court does not need to reach the issue of whether the inventory exception bars Reynolds' claim because Reynolds has not demonstrated that it is entitled to relief under subsection (a) of section 1341.  However, the Court notes that Reynolds would have this Court classify its prior disposal costs as inventorable and included in the cost of goods sold but refrain from applying the inventory exception under § 1341(b)(2).

(v) Conclusion

A brief discussion of Revenue Ruling 2004-17 is appropriate at this point.  The government urges this Court to give some deference to Revenue Ruling 2004-17, issued February 6, 2004, which held that "amounts paid or incurred in the current taxable year to remediate environmental contamination that occurred in prior taxable years do not qualify for treatment under section 1341."

Rev. Rul. 2004-17, 2004-8 I.R.B. 516.  The government urges deference to the ruling because the question presented in this motion is an issue of first impression as to whether § 1341 applies to deductions for environmental remediation expenses.

While the Court's Opinion reflects some of the reasoning in the Revenue Ruling,[11] the Court reached its conclusions independently of the ruling.  Obviously, the Court is mindful of the prevailing view that revenue rulings do not have the force of law and are even viewed by some courts as a statement by a party to the litigation and are therefore the equivalent of a brief in support. See Norfolk Southern Corp. v. Commissioner, 140 F.3d 240, 247 (4th Cir. 1998) ("revenue rulings do not have the force of law"); but see Atchison, Topeka & Santa Fe Ry. Co. v. United States, 61 Fed. Cl. 84, 89 (Ct. Cl. 2004) ("revenue rulings are not binding precedent, but are entitled to some weight, as reflecting an interpretation of the law by the agency entrusted with its interpretation"). In this case, the Court was especially cautious with Revenue Ruling 2004-17 because of its issuance during the pendency of Reynolds' Complaint.

In any event, the Court did not rely on the Ruling as authority.  The Court's decision is based on an independent analysis of § 1341, its history and purpose.  Reynolds' request for relief is well-crafted but it is fundamentally at odds with what a taxpayer should expect to gain from section 1341 because Reynolds did not restore or repay an item previously included in gross income when it incurred the environmental remediation costs from 1992 to 1995.  Therefore, Reynolds cannot

---

[11]The Revenue Ruling concluded, in part, that an unrestricted right to an item of gross income requires that the taxpayer repay or restore the item or portion of the item to another claimant.  The "payment of environmental remediation costs does not restore in a later taxable year any portion of the proceeds received from the original sale" of products.  The amount of the environmental remediation cost bears no relationship to the amount of proceeds received from the sale of products or the amounts expended in prior years complying with environmental regulations.  In other words, CERCLA requires new expenditures based on the amounts needed to remediate the affected area.

establish that this is an allowable deduction for an item of income over which it appeared to have an unrestricted right as required by § 1341(a)(2).  The Court will deny Reynolds' Partial Motion for Summary Judgment and grant the United States' motion because it is entitled to judgment as a matter of law.

An appropriate Order shall issue.

ENTERED this 22nd day of AUGUST, 2005

/s/ James R. Spencer

JAMES R. SPENCER
UNITED STATES DISTRICT JUDGE

21